*This opinion is subject to administrative correction before final disposition.*

# United States Navy-Marine Corps Court of Criminal Appeals

_____

**UNITED STATES**
Appellee

**v.**

**Gregory E. BLANTON, Jr.**
Sergeant (E-5), U.S. Marine Corps
Appellant

**No. 201400419**

Appeal from the United States Navy-Marine Corps Trial Judiciary.

Decided: 8 May 2019.

Military Judges:
Lieutenant Colonel David M. Jones, USMC (trial);
Captain Robert Crow, JAGC, USN (*Dubay* proceedings).

Sentence adjudged 30 June 2014 by a special court-martial convened at Marine Corps Recruit Depot Parris Island, South Carolina, consisting of officer and enlisted members. Sentence approved by convening authority: reduction to E-3, forfeiture of $1,356 pay per month for one month, confinement for one month, and a bad-conduct discharge.

For Appellant:
*Major John J. Stephens, USMC;*
*Lieutenant Daniel E. Rosinski, JAGC, USN;*
*Lieutenant Doug Ottenwess, JAGC, USN.*

For Appellee:
*Major Suzanne M. Dempsey, USMC;*
*Major Tracey L. Holtshirley, USMC;*
*Lieutenant Timothy C. Ceder, JAGC, USN;*
*Captain Brian Farrell, USMC;*
*Lieutenant Megan P. Marinos, JAGC, USN.*

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

Before WOODARD, FULTON, and CRISFIELD,
*Appellate Military Judges.*

Chief Judge WOODARD delivered the opinion of the Court, in which Senior Judge FULTON and Judge CRISFIELD joined.

WOODARD, Chief Judge:

The appellant was convicted, contrary to his pleas, of conspiracy to commit bribery, bribery, sexual harassment, hazing, dereliction, maltreatment, and false official statements, in violation of Articles 81, 134, 92, 93, and 107 Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 934, 892, 893, and 907 (2012).

On appeal, the appellant raises two assignments of error: (1) that his trial defense team (TDT) was ineffective by failing to timely file a motion to suppress his statements to his Sergeant Major; and (2) that the military judge erred by admitting evidence of his invocation of his right to remain silent. This court also specified two additional issues: (1) whether the appellant was sufficiently oriented to the misconduct he was questioned about by the command investigator on 12 March 2013; and (2) if sufficient notice was not provided, whether his TDT was ineffective for failing to timely file a motion to suppress his statements to the command investigator. After careful consideration of the entire record, we find that it was error for the command investigator to question the appellant about misconduct for which she had given him no notice and for the TDT to not raise a motion to suppress these statements. For these errors, we grant relief in our decretal paragraph.

## I. BACKGROUND

The appellant was a non-commissioned officer assigned as an instructor to a training squadron aboard Naval Air Station Pensacola, Florida. Newly-minted Marines assigned an aviation-related military occupational specialty (MOS) were assigned to the appellant's squadron while they awaited transfer to their formal MOS school. These new Marines fell under the appellant's supervision as members of the Marines Awaiting Training (MAT) platoon. At any given time, the MAT platoon consisted of some 400 to 500 students.

The appellant was one of five instructors assigned to the MAT platoon. The appellant's particular role within the MAT platoon was that of "troop

handler." Only the appellant and one other troop handler, Sergeant Tucker, directly supervised the students.

As the MAT platoon troop handlers, the appellant and Sergeant Tucker were responsible for supervising and managing the day-to-day activities of the young Marines assigned to the platoon. They were responsible for mentoring, training, and leading the students by ensuring the students' accountability, good behavior, physical fitness, and compliance with uniform and military appearance regulations. The handlers also ensured that the students attended to their individual medical and dental readiness so that when the time came they would be ready and able to transfer to their formal MOS schools. In order to manage the activities of so many individuals, students were placed in leadership positions within the platoon to assist the troop handlers.

In early 2013, the appellant's command became aware of allegations of misconduct by the permanent personnel members of the MAT platoon. The allegations were that the permanent personnel members had physically assaulted and sexually harassed students, and had participated in games of strip dice with students.[1] The appellant was initially questioned about the alleged misconduct by his Sergeant Major and denied any involvement or knowledge of the misconduct. A search of the appellant's office resulted in the seizure of a set of dice.

A full command investigation was then convened into the alleged misconduct. Captain S was appointed as the command investigator. During her investigation, Captain S twice interviewed the appellant. In her initial interview of the appellant, Captain S advised the appellant that he was suspected of "sexual harassment and misconduct," and the appellant answered some but not all of her questions. The appellant admitted to having dice in his office for physical training purposes, and denied ever mentioning a student's pregnancy in front of other students.

After conducting her initial interview of the appellant, Captain S learned from her interviews with MAT platoon students that the appellant had also accepted money from the students in order to avoid participating in physical training events, wearing the prescribed uniform of the day, and completing

---

[1] As described by the students, the game of strip dice involved the participants taking turns rolling the dice. Whomever had the lowest total in their roll had to remove an article of clothing. Record at 356 and 378.

homework assignments. With this information now in hand, Captain S called the appellant in for a second interview.

Before questioning the appellant a second time, once again Captain S only advised the appellant that he was suspected of "sexual harassment and misconduct." The appellant told Captain S that he had consulted with counsel and would now answer some of the questions he had declined to answer during his previous interview. Specifically, the appellant stated that he had been alone with students behind closed doors; he had not witnessed Sergeant Tucker assault a student; and he denied ever inviting a student to play a dice game.

After going over the questions the appellant had initially declined to answer, Captain S asked the appellant questions related to the new allegations—that the appellant had collected money from the MAT platoon students. As before, the appellant agreed to answer some of Captain S's questions and declined to answer others. He told Captain S that he had purchased a television for the MAT platoon barracks lounge with money that the students had collected among themselves. Although the funds collected were sufficient to cover the $800 sales price of the television, he had to pay the sales tax on the television out of his personal funds. Further, he explained that he was unaware that the students had collected the money until the student platoon sergeant gave him the $800. The appellant then asserted that this was the only time that he was aware that money had been collected from the students. Finally, he denied that he ever offered the students an option to pay money to avoid completing a homework assignment.

Based upon the findings of the command investigation, charges against the appellant were referred to a special court-martial. The day the members were to have been seated, the appellant's TDT filed a motion to suppress the statements he made to the Sergeant Major, claiming that the statements had been obtained in violation of the appellant's Article 31(b), UCMJ, rights. However, no motion was made to suppress the statements the appellant had made to Captain S.

Finding no good cause for the untimely filing of the motion, the military judge denied the motion and the case proceeded to trial. The appellant was ultimately convicted of the offenses which are the subject of this appeal.

On appeal, the appellant initially complained that he was denied effective assistance of counsel because his TDT failed to timely file a motion to suppress his statements to his Sergeant Major. Upon consideration of the record of trial and the pleadings of the parties, we determined that the appellant had raised matters sufficient to require an evidentiary hearing in accordance with *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967), to develop facts necessary to adequately review his claim. The *DuBay* judge was instructed to

take evidence on, in addition to other issues: (1) whether the appellant's Sergeant Major had properly advised him of his Article 31(b), UCMJ, rights prior to questioning him; and (2) whether the appellant's TDT evaluated the reasonable likelihood of success of a motion to suppress the appellant's statements to Captain S during his second interview.[2]

The *DuBay* hearing was conducted and the presiding military judge issued extensive findings of fact and conclusions of law.[3] After considering the evidence adduced at the *DuBay* hearing, the military judge concluded that the Sergeant Major had properly advised the appellant of his Article 31(b), UCMJ, rights.[4] Therefore, the *Dubay* judge determined that the appellant's TDT were not ineffective for failing to timely file their motion to suppress the appellant's statements to his Sergeant Major because the motion would have been denied on its merits.[5]

Regarding Captain S's second interview of the appellant, the *DuBay* judge determined that the Article 31(b), UCMJ rights advisement—warning the appellant that he was suspected of "sexual harassment and misconduct"[6]—failed to sufficiently orient the appellant to the bribery accusations.[7] The *DuBay* judge further determined that in evaluating the reasonable likelihood of success of a motion to suppress the appellant's statements to Captain S, the appellant's TDT "failed to realize the significance of the requirement for the rights warning to put [the appellant on] notice as to what [he was] suspected of which would have led to a suppression motion," a motion that would have been successful.[8] Accordingly, the *DuBay* judge determined that the appellant's TDT's "performance was deficient and deprived appellant of his right to counsel."[9]

Following the *DuBay* hearing, we specified two issues: (1) did Captain S sufficiently orient the appellant to the bribery offenses about which he was

---

[2] N-M. Ct. Crim. App. Order of 28 Dec 2015.

[3] AE XLI-A.

[4] *Id.* at 4.

[5] *Id.* at 11.

[6] PE 17 at 1.

[7] AE XLI-A at 25.

[8] *Id.* at 27.

[9] *Id.* at 3.

questioned; and (2) if she did not, did the appellant receive ineffective assistance of counsel when his TDT failed to move to suppress his statements to Captain S concerning the bribery offenses.

We conclude that Captain S failed to sufficiently orient the appellant to the bribery offenses about which she questioned him and that the appellant's TDT was ineffective for failing to file a meritorious motion to suppress statements made by the appellant to Captain S concerning the accusations of bribery. Further, we find that the appellant was prejudiced by his TDT's ineffective assistance.

Additional facts necessary to the resolution of the issues raised are discussed below.

## II. DISCUSSION

### A. Ineffective assistance of counsel

*1. The law*

We review claims of ineffective assistance *de novo. United States v. Captain*, 75 M.J. 99, 102 (C.A.A.F. 2016). The appellant bears the burden of showing: (1) his TDT's performance was deficient; and (2) there is a reasonable probability that the deficient performance prejudiced the appellant at trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to show prejudice under *Strickland's* second prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694. "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696. When evaluating the performance of counsel, we employ a "strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Id.* at 689. Since counsel are presumed competent, the appellant must rebut this presumption by showing specific errors that were unreasonable under prevailing professional norms. *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987). If an accused's TDT consists of more than one counsel, "the performance of defense counsel is measured by the combined efforts of the [TDT] as a whole." *United States v. Boone,* 42 M.J. 308, 313 (C.A.A.F. 1995); *see also United States v. McConnell,* 55 M.J. 479, 481 (C.A.A.F. 2001).

"When a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion to suppress evidence, an appellant must show that there is a reasonable probability that such a motion would have been merito-

rious." *United States v. Harpole,* 77 M.J. 231, 236 (C.A.A.F. 2018) (citations omitted). In this regard, the term "meritorious" is synonymous with "successful." *United States v. Jameson*, 65 M.J. 160, 164 (C.A.A.F. 2007) ("[T]he decisional issue is whether the [a]ppellant has" shown a reasonable probability that "his counsel would have been *successful* if he had filed a timely motion." (emphasis added)). If we determine that appellant's TDT was deficient by failing to timely file an otherwise meritorious motion, we then test for prejudice.

The effectiveness of counsel is a mixed question of law and fact. *United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005). The factual findings of the military judge are reviewed under a clearly erroneous standard, and the ultimate determinations whether the representation was ineffective and, if so, whether it was prejudicial, are reviewed *de novo. United States v. Paxton,* 64 M.J. 484, 488 (C.A.A.F. 2007).

Reviewing the *Dubay* judge's essential findings of fact under a clearly erroneous standard, we conclude that they are supported by the record. We must now consider *de novo* whether these facts support: (1) the *Dubay* judge's finding that the appellant's TDT was not ineffective for failing to raise a timely motion to suppress the appellant's statement to his Sergeant Major; and (2) the *Dubay* judge's finding that the appellant's TDT was ineffective for failing to raise a motion to suppress the appellant's statements concerning the bribery offenses made to Captain S.

*2. Analysis*

Article 31(b), UCMJ, provides:

> No person subject to this chapter may interrogate, or request any statement from . . . a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used against him in a trial by court-martial.

"The purpose of informing a suspect or accused of the nature of the accusation is to orient him to the transaction or incident in which he is allegedly involved." *United States v. Rice,* 29 C.M.R. 340, 342 (C.M.A. 1960). When notifying a servicemember of the nature of the accusation of which he or she is suspected and will be questioned upon, it is not required that the person providing the notice use "[t]he precision and expertise of an attorney" in describing the nature of the accusation. *United States v. Simpson,* 54 M.J. 281, 284 (C.A.A.F. 2000). Nor is it necessary to inform the servicemember being questioned of "each and every possible charge under investigation," as long as

the servicemember is put on notice of the "general nature of the allegation, to include the area of suspicion that focuses the [servicemember] toward the circumstances surrounding" the alleged misconduct being investigated. *Id.* (citations omitted). "[I]t is enough if, from what is said and done, the accused knows the general nature of the charge." *United States v. Davis,* 24 C.M.R. 6, 8 (C.M.A. 1957).

When considering whether the nature-of-the-accusation requirement has been satisfied, we consider the rights warning provided in light of the surrounding circumstances. Among the factors we consider are: "whether the conduct is part of a continuous sequence of events[;] whether the conduct was within the frame of reference supplied by the warnings[;] or whether the interrogator has previous knowledge of the unwarned offenses." *Simpson,* 54 M.J. at 284 (citations omitted).

In addition to being informed of his or her rights under Article 31(b), UCMJ, an accused must also be informed of his rights to counsel. *United States v. Benner,* 57 M.J. 210, 212 (C.A.A.F. 2002). Generally, a statement obtained in violation of an accused's Article 31(b), UCMJ, rights is involuntary and therefore inadmissible. Art. 31(d), UCMJ; *see also* MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 304(a) and 305(c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). "The [g]overnment has the burden of establishing compliance with rights warning requirements by a preponderance of the evidence. *United States v. Simpson,* 54 M.J. 281, 283 (C.A.A.F. 2000); *see also* MIL. R. EVID. 304(f)(6).

The facts in the following two sections of this opinion—II(A)(2)(a) and (b)—are gleaned from the *DuBay* judge's essential findings of fact. Having found that they are supported by the record, we adopt them as our own.

a. Suppression of the appellant's statements to his Sergeant Major

Before the Sergeant Major's interview of the appellant, the Sergeant Major knew of allegations against the appellant and several of his fellow instructors—Staff Sergeant S,[10] Staff Sergeant Wilder, Sergeant Warrens, and Sergeant Tucker. The Sergeant Major was made aware of the alleged misconduct through statements provided by students entrusted to the care of the appellant and his fellow instructors. The misconduct alleged by the students was

---

[10] The command investigation determined that Staff Sergeant S was not involved in any of the alleged misconduct. Staff Sergeant Wilder, Sergeant Warrens, and Sergeant Tucker were all charged and disciplined for their misconduct.

their staff had: (1) participated in games of strip poker with students utilizing dice; (2) assaulted a student; and (3) sexually harassed a student. On the morning of the interview, the Sergeant Major ordered the appellant and his fellow instructors to his office for questioning. However, one of the instructors, Sergeant Tucker, was on leave and did not report to the office. The appellant's Sergeant Major questioned the four instructors who were present for duty that day. First, the Sergeant Major called each suspect into his office, one at a time, for questioning. Then, the Sergeant Major gathered the four suspects together as a group and questioned them collectively.

When the appellant was brought into the Sergeant Major's office for his individual questioning, prior to questioning the appellant, the Sergeant Major informed him of the students' allegations and read the appellant his Article 31(b), UCMJ, rights and his rights to counsel from a standard rights advisement card. The appellant indicated that he understood his rights, waived them, and agreed to answer the Sergeant Major's questions without consulting counsel.

Here, the appellant's account and that of others diverge. Both the appellant and the Sergeant Major agree that, after initially waiving his rights, the appellant subsequently invoked his right to counsel. The appellant claims he invoked his right to counsel while the Sergeant Major was questioning him individually. The appellant testified during the *DuBay* hearing that he invoked his right to counsel during individual questioning, and he specifically identified a witness who he claimed saw him do so. However, that named witness and the Sergeant Major testified that no such invocation occurred while the Sergeant Major individually questioned the appellant. Therefore, the *DuBay* judge found the appellant's testimony was unsupported and contradicted, and he found as fact that the appellant did not invoke his right to counsel until the Sergeant Major later questioned the appellant in a group setting with the other suspected instructors.

The judge found that the appellant made the following two statements in the group setting before he invoked his right to counsel: (1) he denied that he had any dice in his office; and (2) he denied playing dice games with any student. These denials formed the factual basis for two of the appellant's false official statement offenses (Charge III, Specifications 2 and 3). The statements were introduced at trial, and the appellant was convicted of both false statement offenses. During the *DuBay* hearing, the appellant denied that he made the two statements, but a Master Gunnery Sergeant testified otherwise.

After the appellant denied having dice in his office and denied playing dice with students, the Sergeant Major talked about his plan to search the instructors' office spaces. At that point, the appellant asked to go to his office

to retrieve some personal items. The Sergeant Major denied his request and sent someone to search the instructors' office spaces.[11] The Sergeant Major began discussing what items of evidence might be found in the offices. It was at this point, according to the Sergeant Major and as found by the *DuBay* judge, that the appellant invoked his right to counsel. The Sergeant Major continued to question the appellant after he had invoked his right to counsel, but no post-invocation statements were introduced against him at trial.

Like the *DuBay* judge, we conclude that the appellant was properly informed of the offenses of which he was suspected, and he was properly advised of both his Article 31(b), UCMJ, rights and his right to counsel. The appellant voluntarily waived his rights, answered the Sergeant Major's questions, and made the two denials in question prior to invoking his right to counsel. No statements made by the appellant after his invocation of counsel were used as a basis for a charge or introduced against him at trial. Accordingly, we conclude that the appellant's TDT was not deficient for failing to timely file the motion to suppress his pre-invocation statements to his Sergeant Major. We find there is no reasonable probability that a motion to suppress the pre-invocation statements that were later introduced against him at trial would have been successful.

Accordingly, the appellant's claim that his TDT was ineffective for failing to timely raise this motion is without merit.

b. Suppression of the appellant's statements made in the second interview with Captain S

Following the Sergeant Major's questioning of the instructors and the search of their office spaces, the appellant's commanding officer initiated a command investigation into the allegations raised by the students. Captain S was appointed as the command investigator. While conducting the investigation, Captain S twice interviewed the appellant. She first questioned the appellant on 28 February and then questioned him again on 12 March.

Before questioning the appellant on 28 February, Captain S provided the appellant with a rights acknowledgement and waiver form and informed him that he was suspected of "sexual harassment and misconduct." During the *Dubay* proceeding, Captain S explained that she instructed the appellant

---

[11] The *DuBay* judge considered whether this search was a search in the context of the Fourth Amendment. He found that it was not. We concur with the *DuBay* judge's findings and conclusions. *See* AE XLI-A at 7, 16, and 36.

that he could answer some, all, or none of her questions. The appellant stated he understood his rights, initialed and signed the rights advisement form, and agreed to waive his rights under Article 31(b), UCMJ, and his right to counsel and agreed to speak with Captain S. Captain S asked the appellant questions she had crafted and typed into a word processing document. As she asked the appellant the questions, she typed his responses into the document. At the conclusion of the interview, Captain S printed the document and allowed the appellant to review it for accuracy and to make any changes needed. She had the appellant sign the document, and she gave him a signed copy. The appellant answered 7 of the 16 questions asked by Captain S on 28 February. When Captain S interviewed the appellant on 28 February, she was unaware of any bribery allegations against the appellant. The following are the questions asked on 28 February by Captain S and the responses provided by the appellant.

> Q: When did you check-in [sic] to AMS-1?

> A: August or September 2010.

> Q: What positions have [sic] since checking into AMS-1?

> A: Instructor, Troop Handler, Urinalysis coordinator, Color Guard member and PT coordinator. Most recently I was a troop handler and PT coordinator.

> Q: What were your daily duties?

> A: Ensured quality of life for the students in the barracks, PT coordination, mentorship and room inspections.

> Q: How much interaction with students did you have?

> A: All day, every day.

> Q: Were you ever alone with students?

> A: *I choose not to answer this question.*

> Q: Did you keep the door open or closed while alone with students?

> A: *I choose not to answer this question.*

> Q: Did you ever reference a student's pregnancy status?

> A: No.

> Q: Have you ever put your hands on a student in a non-instructional way?

> A: No.

Q: Have you seen any other AMS-1 staff member touch a student in an inappropriate manner?

A: *I choose not to answer this question.*

Q: On 28 January, did you see an AMS-1 staff member touch/grab [a student]?

A: *I choose not to answer this question.*

Q: On 28 January, did you see Sgt Tucker grab [a student] by the arm and drag her toward the ladder well?

A: *I choose not to answer this question.*

Q: Do you keep dice in your office? If so, for what purpose?

A: Yes for PT purposes (i.e. to determine the quantity of exercises during a PT session.)

Q: Have you ever invited a student to play a game of dice?

A: *I choose not to answer this question.*

Q: Was the door open or closed?

A: *I choose not to answer this question.*

Q: Was it a game of strip dice?

A: *I choose not to answer this question.*

Q: What students have you asked to play this game?

A: *I choose not to answer this question.*[12]

Following the appellant's first interview with Captain S, the appellant took the document and sought legal counsel. Meanwhile, Captain S became aware of bribery allegations involving the appellant. She interviewed the appellant for a second time on 12 March. Prior to interviewing the appellant, Captain S re-advised him of his rights using the same rights advisement form she had used on 28 February which notified him that he was suspected of "sexual harassment and misconduct." Although Captain S was now aware of the bribery allegations and intended to ask the appellant questions concerning these new allegations, she made no mention of this new misconduct when she advised the appellant of his rights on 12 March. The appellant informed Captain S that he had spoken with defense counsel and that he would be will-

---

[12] PE 18 at 1-2 (emphasis added).

ing to answer some of the questions he had previously declined to answer. Captain S then re-asked the appellant the questions he had previously declined to answer on 28 February. Captain S again used the word processing document to record the appellant's answers. Of the nine questions the appellant had declined to answer on 28 February, the appellant answered six. For each of these six questions, Captain S documented that the appellant was answering the questions after having consulted with counsel. She did so by noting in the document after each question to which it applied, "[On 12 March . . . question was revisited via legal advice]."[13] Captain S then went on to ask the appellant an additional 14 questions related to the bribery offenses. The appellant answered 13 of these 14 questions.

The following are the questions from the 28 February interview that were re-asked by Captain S on 12 March with her notations, and the responses provided by the appellant.

> Q: Were you ever alone with students?
>
> A: *[On 12 March…question was revisited via legal counsel]* Yes. From time to time.
>
> Q: Did you keep the door open or closed while alone with students?
>
> A: *[On 12 March…question was revisited via legal counsel]* Sometimes it was open and sometimes it was closed.
>
> . . .
>
> Q: Have you seen any other AMS-1 staff member touch a student in an inappropriate manner?
>
> A: *[On 12 March…question was revisited via legal counsel]* No.
>
> Q: On 28 January, did you see an AMS-1 staff member touch/grab [a student]?
>
> A: *[On 12 March…question was revisited via legal counsel]* No.
>
> Q: On 28 January, did you see Sgt Tucker grab [a student] by the arm and drag her toward the ladder well?

---

[13] *Id.*

A: *[On 12 March…question was revisited via legal counsel]* No.

. . .

Q: Have you ever invited a student to play a game of dice?

A: *[On 12 March…question was revisited via legal counsel]* No.

Q: Was the door open or closed?

A: *I choose not to answer this question.*

Q: Was it a game of strip dice?

A: *I choose not to answer this question.*

Q: What students have you asked to play this game?

A: *I choose not to answer this question.*[14]

The following are the questions related to the bribery allegations asked by Capt S on 12 March and the responses provided by the appellant.

Q: When was the TV for the upstairs lounge purchased?

A: Late January/February.

Q: Who picked it up at the store?

A: I did.

Q: Which store?

A: HHGreg [sic].

Q: Receipt?

A: In the barracks. It was on my desk in a brown folder that was unmarked. I remember it being in the range of 800 dollars. I paid the taxes for the TV.

Q: What else was purchased from [sic] the students?

A: I don't know. I gave them an old entertainment center.

Q: Who did you take the money from?

A: The platoon sergeant.

---

[14] PE 18 at 1-2 (emphasis added).

Q: Were you present when the money was collected?

A: No. I didn't know they were collecting the money until they gave it to me in my office.

Q: How did the students come up with the idea of a new TV?

A: The students approached me before Christmas break wanting a new television for [the] DVD lounge. I don't know where the PS3 came from.

Q: Was it one time that money was collected?

A: Yes. It was late Jan or early Feb.

Q: Did you buy the TV with cash?

A: Yes.

Q: Is there any sort of a record or log recording the students who gave money?

A: No.

Q: Did you ever offer any sort of buyouts while in the troop handler position?

A: *I choose not to answer the question.*

Q: Did you ever offer a buyout for homework assignment?

A: No.

Did you witness any other AMS-1 staff bringing up buyouts to students?

A: I can't recall.[15]

Just as she had done at the end of the 28 February interview, Captain S printed the document, allowed the appellant to review it for accuracy and to make any changes needed. She had the appellant sign the document, and provided him with a signed copy.

During the *DuBay* hearing, both members of the appellant's TDT testified that they considered filing a motion to suppress the appellant's statements to Captain S. However, after interviewing the appellant's Sergeant Major and

---

[15] *Id.* at 3-4 (emphasis added).

Captain S, and discussing the issue with their supervisory counsel, they believed that because Captain S had provided the appellant with a rights advisement—albeit exactly the same rights advisement—before both interviews, and because the appellant had waived his rights, a motion to suppress the appellant's statements to Captain S was not reasonably likely to succeed. When asked whether the "and misconduct" portion of Captain S's rights advisement was sufficient to put the appellant on notice of the bribery offenses, both counsel indicated they believed it was.

Courts have long been faced with the question of whether an accused or suspect has been properly informed of the nature of the accusation against them. *See Simpson,* 54 M.J. at 284. This case presents another such question. The question we must initially resolve is whether the language "and misconduct" in Captain S's rights advisement to the appellant "sufficiently orient[ed]" him "toward the circumstances surrounding the" bribery offenses about which he was questioned. *United States v. Huelsman,* 27 M.J. 511 (A.C.M.R. 1988) (citing *United States v. Schultz,* 41 C.M.R. 31 (C.M.A. 1970). We agree with the *DuBay* judge that it did not.

In this case, we are certain that before speaking with Captain S on both 28 February and 12 March, the rights advisements provided by his Sergeant Major and Captain S placed him on notice that the general nature of the accusations about which he may be questioned involved: (1) playing strip dice with students; (2) the assault of a student by an instructor; and (3) the sexual harassment of students. However, when we evaluate the "and misconduct" language contained in Captain S's rights advisement to the appellant using the *Simpson* factors—continuous sequence of events, the frame of reference supplied by the warnings, and previous knowledge of the offense by the questioner—we conclude that the "and misconduct" language did not sufficiently orient the appellant to the circumstances surrounding the bribery allegations.

First, although the appellant's actions giving rise to the bribery allegations occurred within the same time frame and also involved students, we conclude that the bribery offenses are not so closely related factually to the allegations of strip dice, assault, and sexual harassment as to have been part of a continuous sequence of events.

Second, in the context of the facts in this case, the language "and misconduct" was overly broad. While the frame of reference provided by the language "and misconduct" fairly includes allegations of bribery, it would also fairly include *any* UCMJ violation. Thus, although bribery would be included in the frame of reference provided, this overbroad frame of reference provided the appellant no orientation as to the nature of the bribery allegations so "as to allow him intelligently to weigh the consequences of responding to [Cap-

tain S's] inquiries." *United States v. Reynolds,* 37 C.M.R. 23, 25 (C.M.A. 1966) (citation omitted).

Third, although Captain S had no knowledge of the bribery allegations when she initially interviewed the appellant, before interviewing him the second time, Captain S had gained considerable knowledge of the bribery allegations through her interviews with the MAT platoon students. In fact, the record establishes that before her second interview of the appellant, she had prepared written questions to ask the appellant related to the bribery allegations. Further, she testified at the *DuBay* hearing that she intended to ask him questions about the bribery allegations.

Based upon our evaluation of the *Simpson* factors, we conclude that the language "and misconduct" contained in the rights advisement provided by Captain S to the appellant before the second interview failed to sufficiently orient him to the bribery accusations. Further, because Captain S had knowledge of these accusations before conducting the second interview and intended to ask the appellant questions about them, she was obligated to advise him of these new accusations before she questioned him on them. *See Reynolds,* 37 C.M.R. at 25. Hence, the accused's statements to Captain S on 12 March regarding the bribery accusations were obtained in violation of Article 31(b), UCMJ, and were therefore inadmissible. However, the remainder of the appellant's responsive statements to Captain S's questions in both interviews are admissible.

Having concluded that the appellant's statements to Captain S in his second interview related to bribery are inadmissible, we also conclude—as did the *DuBay* judge—that the appellant's TDT was deficient by failing to raise a motion to suppress on this issue—a motion we have concluded would have been successful. Under the *Strickland* prejudice standard, the prejudice to the appellant resulting from his TDT's deficiency is obvious. The appellant's statements to Captain S in the second interview concerning the bribery accusations were directly related to the *corpus delicti* of three of the false official statements of which he was convicted—Specifications 5, 6, and 7 of Charge III.[16] Had the motion to suppress been filed, these offenses would not have been before the members. As such the appellant's convictions for these offenses cannot stand. However, we conclude the remaining findings are un-

---

[16] Following the announcement of findings by the members, finding them to be an unreasonable multiplication of charges, the military judge merged Specifications 4, 5, 6, 7, and 8 of Charge III for findings. Record at 713-15.

tainted by the appellant's TDT's noted deficiency and may be approved as no error materially prejudicial to appellant's substantial rights related to the remaining offenses occurred. *See United States v. Newak,* No. ACM 23544 (reh), 1989 CMR LEXIS 60, at *3 (A.F. Ct. Crim. App. 6 Jan 1989) (unpub. op.), *aff'd,* 29 M.J. 304 (C.M.A. 1989), *cert. denied,* 493 U.S. 1070 (1990). We will take appropriate action to set aside the findings of guilty to Specifications 5, 6, and 7 of Charge III in our decretal paragraph.

## B. Admission into evidence of appellant's invocation of his Fifth Amendment right to remain silent.

In his second assignment of error, the appellant asserts that the military judge erred by allowing the government to present evidence that the appellant invoked his right to remain silent and that the military judge compounded that error by failing to provide a curative instruction. We agree and will test this error for prejudice.

### 1. Additional background

As previously discussed, during Captain S's interviews of the appellant, he declined to answer several of Captain S's questions and Captain S recorded the appellant's invocation of his right to remain silent to those questions in her interview summary. Additionally, for those questions the appellant initially declined to answer on 28 February but, after consulting with counsel, answered on 12 March, Captain S also noted that the appellant was answering these questions after exercising his right to counsel.

At trial, Captain S was called by the government to testify concerning her investigation into the appellant's misconduct. Captain S testified that she questioned the appellant on two separate occasions within a two-week period and on both occasions she advised him of his Article 31(b), UCMJ, rights.[17] While testifying concerning her interviews of the appellant, the following colloquy took place between the trial counsel and Captain S without objection from the appellant's TDT or interruption from the military judge:

> Q: Did you ask him whether on 28 January he observed Sergeant Tucker grab another student by the arm and drag her towards the stairwell?
>
> A: I did.

---

[17] The appellant's rights advisement form was admitted into evidence as PE 17. Record at 420.

Q: And what was his response?

A: During the first interview, he said *I choose not to answer that question.*

Q: And did you ask him whether he had ever invited a student to play a game of dice?

A: I did.

Q: And what was his response to that question?

A: Initially, I believe it was, *"I choose not to answer this question."*[18]

Captain S went on to explain how she prepared a word processing document with questions and turned that document into a written statement, as was described above. Without objection from his TDT, or inquiry by the military judge, trial counsel offered—and the military judge admitted—into evidence as a prosecution exhibit the statement signed by the appellant after the second interview. As described above, the statement reflected that the appellant responded, *"I choose not to answer this question"* to 10 of 30 questions posed by Captain S.[19]

The appellant's TDT did not object to the admission of evidence of the appellant's invocation of his right to remain silent and the exercise of his right to counsel, nor did they request that the military judge give the members a limiting or curative instruction. The military judge did not give an instruction *sua sponte.*

---

[18] Record at 421 (emphasis added).

[19] PE 18. During the interview on 28 February 2013, the appellant invoked his right to remain silent to 9 of the 16 questions asked. PE 18 at 1-2. During the interview of 12 March 2013, the appellant provided answers to six of the nine questions to which he had initially invoked his right to remain silent. Captain S indicated the appellant's response to these six questions by noting in her summary "On 12 March . . . question was revisited via legal counsel." PE 18 at 1-2. The appellant invoked his right to remain silent to 1 of the 14 questions asked for the first time on 12 March 2013. PE 18 at 4.

*2. Analysis*

a. Was it error?

"The fact that the accused during official questioning and in the exercise of rights under the Fifth Amendment to the United States Constitution or Article 31 remained silent, refused to answer a certain question, requested counsel, or requested that the questioning be terminated, is not admissible against the accused." MIL. R. EVID. 301(f)(2); s*ee United States v. Riley,* 47 M.J. 276, 279-80 (C.A.A.F. 1997) (holding that a suspect's lawful invocation of his constitutional rights to remain silent or to assistance of counsel during an interview with criminal investigation authorities is inadmissible against that suspect). "The law generally discourages trial counsel's presentation of testimony . . . [of] an accused's invocation of his constitutional rights unless, for example, an accused invites such testimony." *United States v. Moran,* 65 M.J. 178, 181 (C.A.A.F. 2007) (citations omitted); *see also United States v. Gilley,* 56 M.J. 113, 121 (C.A.A.F. 2001) (holding that the accused may open the door to the discussion of his invocation of his rights when he pursues a trial strategy based on attacking the veracity of the investigating agents).

We review *de novo* whether there has been an improper reference to an accused's invocation of his constitutional rights. *Moran,* 65 M.J. at 181 (citing *United States v. Alameda,* 57 M.J. 190, 198 (C.A.A.F. 2002). If the appellant failed to object to the reference at trial, as in this case, the issue is forfeited absent "plain error." *Id.*; *United States v. Pope,* 69 M.J. 328, 334 (C.A.A.F. 2011); *United States v. Bungert,* 62 M.J. 346, 347 (C.A.A.F. 2006). We also review *de novo* whether there was plain error. *Moran,* 65 M.J. at 181. "Plain error" is error that is plain, clear or obvious, and results in material prejudice to an appellant's substantial rights. *United States v. Powell,* 49 M.J. 460, 463-65 (C.A.A.F. 1998). Prejudicial error is error that "had 'an unfair prejudicial impact' on the findings or sentence." *United States v. Schlamer,* 52 M.J. 80, 86 (C.A.A.F. 1999) (quoting *Powell,* 49 M.J. at 465). Similarly, we review the military judge's failure to give an appropriate curative instruction for plain error. *United States v. Gilley,* 56 M.J. 113, 123 (C.A.A.F. 2001); *United States v. Ross,* 7 M.J. 174, 176 (C.M.A. 1979).

In *Riley,* our superior court found an accused's pretrial right to silence to be a substantial right of "critical importance" that was guaranteed by Article 31, UCMJ. *Riley,* 47 M.J. at 279. The court noted:

It is the well-settled law of this Court that it is improper to bring to the attention of the triers of fact that an accused, upon being questioned on an occasion prior to trial, asserted his rights to counsel or to remain silent. . . . This principle is founded upon the open-eyed realization that to many, even to

> those who ought [to] know better, the invocation by a suspect of
> his constitutional and statutory rights to silence and to counsel
> equates to a conclusion of guilt – that a truly innocent accused
> has nothing to hide behind assertion of these privileges.

*Id.* (quoting *United States v. Moore*, 1 M.J. 390, 391 (C.M.A. 1976).

In applying the test for plain error, the court in *Riley* found material prejudice when an investigator testified that an accused had invoked his pretrial right to remain silent, the defense failed to object, and the military judge failed thereafter to provide a curative instruction. 47 M.J. at 279-80. The court concluded that this testimony became the "filter" through which the other evidence was viewed by the members. *Id.* at 280. As a result, "these circumstances posed a heightened risk" that the members would infer the accused had something to hide. *Id.*

Here, it was clear and obvious error to admit Captain S's testimony that the appellant invoked his right to remain silent and to admit the portions of the written statement that noted that the appellant invoked his right to remain silent and his right to consult with counsel. There was no legally-proper reason for the government to proactively elicit or provide this information to the members. The record contains no indication that the appellant invited the presentation of evidence of his invocations. His trial strategy did not involve attacking Captain S's veracity, the truthfulness of her testimony, or the accuracy of her summary. It was the government who twice specifically elicited from Captain S testimony regarding the appellant's invocation of his rights, and then offered into evidence her summary which contained another 10 instances of the appellant's invocation of his rights. All the questions to which the appellant invoked his right to remain silent were related to offenses of which the members convicted him.

It was also clear and obvious error for the military judge to fail to issue a curative or limiting instruction regarding the panel's proper use, if any, of this information. Although the appellant's TDT did not object to Captain S's testimony or to the admission of his statement, the military judge must be "more than a mere referee, and as such he is required to assure that the accused receives a fair trial." *United States v. Graves,* 1 M.J. 50, 53 (C.M.A. 1975). In furtherance of this duty, with regard to Captain S's testimony, the military judge here had an obligation to *sua sponte* prevent the government from deliberately eliciting further inadmissible testimony and to instruct the members by issuance of a curative instruction. *See Riley,* 47 M.J. at 280; *United States v. Miller,* 48 M.J. 811, 816 (N-M. Ct. Crim. App. 1998). Even if the military judge believed the government had a legitimate reason to admit evidence that the appellant invoked his rights to silence and to consult with counsel, he nonetheless should have issued a limiting instruction to the

members to prevent them from misusing such evidence. *United States v. Ross,* 7 M.J. 174, 176 (C.M.A. 1979).

### b. Assessment of prejudice to the appellant

We must now assess the prejudicial impact, if any, of these errors. When the government brings such inadmissible information to the attention of the members, the test for prejudice is the constitutional standard of harmless beyond a reasonable doubt. *United States v. Moore,* 1 M.J. 390, 391-92 (C.M.A. 1976) (relying upon *United States v. Ward,* 1 M.J. 176, 180 (C.M.A. 1975)); *see* U.S. CONST. amend. V; *Chapman v. California,* 386 U.S. 18, 21-22 (1967). Applying this standard, we must set aside the appellant's convictions unless our "examination of the record supports the conclusion that there is no reasonable possibility that the error might have contributed to the conviction[s]." *Moore,* 1 M.J. at 392. "This determination is made on the basis of the entire record, and its resolution will vary depending on the facts and particulars of the individual case," including the circumstances surrounding the admission of the objectionable evidence. *United States v. Sweeny*, 70 M.J. 296, 306 (C.A.A.F. 2011) (quoting *United States v. Blazier*, 69 M.J. 218, 226-27 (C.A.A.F. 2010)); *see also United States v. Sidwell,* 51 M.J. 262, 265 (C.A.A.F. 1999). Our harmless error inquiry is not whether the members were completely unaware of the error; rather, it is whether the error was "unimportant in relation to everything else the jury considered on the issue in question." *Moran,* 65 M.J. at 187 (quoting *Yates v. Evatt,* 500 U.S. 391 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62 (1991)). In evaluating whether the error was harmless beyond a reasonable doubt, we consider the effect of the error on the other evidence presented in the case, the nature of the improper evidence, and any curative instructions given to the members. *Sidwell*, 51 M.J. at 265. In reaching our conclusions regarding harmless error here, we find Chief Justice Rehnquist's observations in *Arizona v. Fulminante*, 499 U.S. 279 (1991), instructive. After reviewing many constitutional error cases in which harmless error analysis was found to be appropriate, he wrote:

> The common thread connecting these cases is that each involved "trial error" – error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. In applying harmless-error analysis to these many different constitutional violations, the Court has been faithful to the belief that harmless-error doctrine is essential to preserve the "principle that the central purpose of a criminal trial is to decide the factual questions of the defendant's guilt or innocence, and promotes public respect for the

criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error."

*Id.* at 307-08 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 681 (1986)).

Although we are troubled by the government's seemingly purposeful and deliberate introduction into evidence of the appellant's invocations (and the TDT's and military judge's failure to stop it), considering the record as a whole we do not find that the erroneously admitted evidence was reasonably likely to affect the outcome of the trial. In addition to the overwhelming factual basis for the appellant's convictions discussed below, we also note that the government did not mention the invocations or argue that the members should use them in a manner averse to the appellant. Further, despite the erroneously admitted evidence, the members' not guilty findings strongly suggest that on the whole, the erroneously admitted invocations were "unimportant in relation to everything else the [members] considered on the issue[s] in question." *Moran,* 65 M.J. at 187. Having already concluded that the appellant's convictions on Specifications 5, 6, and 7 of Charge III must be set aside, we will not address these offenses.[20]

(1) Bribery related offenses: Charge I, Specification 6; Charge V, Specifications 1, 2, and 3; and Additional Charge, sole specification.

At trial, the government presented the testimony of 10 students, who all confirmed that the appellant collected "brick"[21] sized stacks of currency from the students in exchange for them not having to: (1) wear the mandated uniform of the day; (2) participate in unit physical training; and (3) complete homework assignments. In addition, his co-conspirator—Sergeant Tucker— also confirmed that he and the appellant agreed to accept money from students who wanted to avoid wearing the mandated uniform of the day on at least two occasions. Further, six of the appellant's fellow unit members testified that during the timeframe that the appellant collected money from the students, doing so for any purpose was strictly prohibited by the appellant's command. Finally, as evidence of his consciousness of guilt, the government introduced several posts from the appellant's social media account which were directed at his co-conspirator, Sergeant Tucker. The appellant made these posts after Sergeant Tucker had entered a pretrial agreement in which

---

[20] *See* II(A)(3)(b) of this opinion.

[21] Record at 340.

he had agreed to testify against the appellant. One post read, "[a]ll rats should die. They everywhere down here. By the [barracks] and in the trash can. Do you feel the same way Dave Tucker?"[22] Another post, containing a link to the rap song S.N.I.T.C.H., stated, "I love this song. Me, Dave Tucker played this every day at work."[23]

Based upon the overwhelming evidence of the appellant's guilt as to Charge I, Specification 6 (dereliction of duty for failing to require the wearing of the uniform of the day); Charge V, Specifications 1, 2, and 3 (bribery by accepting money from students so that they could avoid participation in unit physical training, completing homework assignments, and wearing the uniform of the day); and the sole specification of the Additional Charge (conspiracy to commit bribery), we conclude the error was harmless beyond a reasonable doubt.

(2) False official statements: Charge III, Specifications 1, 2, 3, 4, and 8.

In Charge III, Specifications 1 and 2, the appellant was charged with making a false official statement to his Sergeant Major when he denied that he had any dice in his office or that he had played dice with any student. Above, we carefully analyzed which of the appellant's statements were subject to suppression under Article Article 31(b), UCMJ. We determined that the appellant's two denials that formed the basis of these specifications were made before the appellant invoked his right to counsel and were therefore admissible. The senior staff non-commissioned officer who was present at the interview testified that the appellant denied possessing dice and playing dice with any student. To show the falsity of those statements, the government introduced the appellant's statements to Captain S during the first interview—that he did keep dice in his office, and that he used them "to determine the quantity of exercises during a [physical training] session."[24] As analyzed above, those statements were taken in compliance with Article 31(b), UCMJ and were properly admitted. Further, multiple female students testified that the appellant invited them to participate in a game of dice in his office with him and Sergeant Tucker. After explaining the game and each rolling the dice, the appellant informed the female students that they were playing strip

---

[22] *Id.* at 460; PE 22 at 1.

[23] Record at 460-61; PE 22 at 2-3.

[24] PE 18 at 2.

dice, they had lost, and needed to remove an item of clothing. The students described the dice used to play the game as a pair of black dice with white spots. Additionally, testimony was admitted that a pair of dice, matching those described by the students, was found in the appellant's office in plain view on his desk.

In Charge III, Specification 3, the appellant was charged with making a false official statement to Captain S on 28 February when he denied ever referring to a student's pregnancy status. The record indicates that the appellant did not invoke his right to remain silent to the question that elicited his denial. At trial, Captain S testified that the appellant denied ever referring to a student's pregnancy status. Additionally, multiple witnesses testified that the appellant discussed and joked about the student's pregnancy status in a public forum.

In Charge III, Specification 4, the appellant was charged with making a false official statement to Captain S on 12 March when he denied ever inviting a student to play a game of dice. Despite initially invoking his right to remain silent to the question on 28 February, the record indicates that the appellant agreed, after being re-advised of his right to remain silent and right to counsel, to answer the question on 12 March. When he answered the question, the appellant denied ever inviting a student to play a game of dice. Again, multiple female students testified that the appellant invited them to participate in a game of dice in his office and after rolling the dice were told by appellant that they were playing strip dice. The students described the dice and dice matching the description were found in the appellant's office.

In Charge III, Specification 8, the appellant was charged with making a false official statement to Captain S on 12 March when he denied seeing Sergeant Tucker assault a student. Although on 28 February the appellant initially invoked his right to remain silent to the question, the record indicates that the appellant agreed, after being re-advised of his right to remain silent and right to counsel, to answer the question on 12 March. When he answered the question, the appellant denied seeing Sergeant Tucker assault the student. At trial, the government introduced a video of the assault.[25] The video plainly shows Sergeant Tucker assaulting the student in the appellant's presence. Sergeant Tucker identified himself and the appellant in the video, and testified that the appellant was standing directly behind him when he assaulted the student. Additionally, the student who was assaulted testified.

---

[25] The video was admitted at trial as PE 21.

She identified herself, Sergeant Tucker, and the appellant in the video. She further testified that at the time of the assault the appellant was "[t]wo and a half, three feet behind [Sergeant] Tucker . . . [l]ooking back at what's happening."[26]

Based upon the overwhelming evidence of the appellant's guilt to Charge III, Specifications 1, 2, 3, 4, and 8, we conclude the error was harmless beyond a reasonable doubt.

(3) Violation of a lawful general order and maltreatment: Charge I, Specifications 1 and 2, and Charge II, Specification 1.

In Charge I, Specifications 1 and 2, the appellant was charged with violating lawful general orders. In Specification 1, it was alleged that he violated Marine Corps Order 1000.9A by sexually harassing a female student. In Specification 2, it was alleged that he violated Marine Corps Order 1700.28A by hazing the same female student. In Charge II, Specification 1, the appellant was charged with maltreating the same female student by sexually harassing her. Copies of the Marine Corps sexual harassment and hazing orders were admitted into evidence as Prosecution Exhibits 2 and 3, respectively.

At trial, the female student, Sergeant Tucker, and other witnesses testified that the appellant made repeated sexual comments in the presence of the students. These statements included comments about females not being able to perform certain activities because of their gender; comments about playing stripping games, patronizing strip clubs; and the appellant's discussion of his intimate relations with his spouse. Additionally, as previously discussed, the appellant also made comments regarding the female student's pregnancy in a public forum. While in this public forum, the appellant joked that all the male students in the unit would have to appear on the Jerry Springer Show in order to determine the paternity of the female student's baby. The female student provided compelling testimony describing the mental harm she suffered from these statements.

Based upon the overwhelming evidence of the appellant's guilt to Charge I, Specifications 1 and 2, and Charge II, Specification 1, we conclude the error was harmless beyond a reasonable doubt.

---

[26] Record at 499.

**C. Sentence reassessment**

Having set aside the findings of guilty to Specifications 5, 6, and 7 of Charge III, we must now determine if we are able to reassess the appellant's sentence. We have "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). However, we can only reassess a sentence if we are confident "that, absent any error, the sentence adjudged would have been of at least a certain severity[.]" *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). A reassessed sentence must not only "be purged of prejudicial error [but] also must be 'appropriate' for the offense[s] involved." *Id.*

In determining whether to reassess a sentence or to order a sentencing rehearing, we consider the five factors espoused in our superior court's holding in *Winckelmann*: (1) whether there has been a dramatic change in the penalty landscape and exposure; (2) the forum of the court-martial; (3) whether the remaining offenses capture the gravamen of the criminal conduct; (4) whether significant aggravating circumstances remain admissible and relevant; and (5) whether the remaining offenses are the type with which we as appellate judges have experience and familiarity to reasonably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15-16.

Under all circumstances presented, we find that we can reassess the sentence and it is appropriate for us to do so. First, the penalty landscape has not changed. Considering the appellant was tried by special court-martial, our action in reducing the number of appellant's false official statement convictions from eight to five has not changed the penalty landscape. The appellant still faces the jurisdictional maximum for that forum. Further, at trial, the military judge merged five of the six false official statement convictions for the statements the appellant made to Captain S into a single offense. Second, although the appellant was sentenced by members, we have extensive experience and familiarity with the remaining offenses. Finally, the remaining offenses capture the gravamen of the appellant's criminal conduct—he conspired to receive bribes and ultimately received bribes from the students entrusted into his care; hazed, sexually harassed, and maltreated a student; was derelict in the performance of his duties; and made multiple false official statements to both his Sergeant Major and Captain S.

Taking these facts as a whole, we can confidently and reliably determine that, absent the error, members would sentence the appellant to at least a bad-conduct discharge and a reduction to E-3. We find this sentence to be an appropriate punishment for the remaining convictions and this offender—thus satisfying the requirement for a reassessed sentence which is purged of error and which is appropriate. *Sales,* 22 M.J. at 308.

**D. Appellate delay**

Though not raised as an issue on appeal, we note that the delay of more than 18 months between the time this case was docketed with this court and completion of appellate review is facially unreasonable. Because the delay is facially unreasonable, we examine the four factors set forth in *Barker v. Wingo,* 407 U.S. 514 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *United States v. Moreno,* 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted).

The appellant was sentenced 30 June 2014 and after a post-trial motions hearing, his court-martial was initially docketed with this court on 25 November 2014. The appellant requested, and was granted, numerous extensions of time (EOT) to file his initial assignments of error. The appellant filed his brief and assignment of errors on 20 April 2015, after all but the bad-conduct discharge portion of his sentence had been executed and served.

After receiving the appellant's brief, which included an assignment of error alleging ineffective assistance of counsel, the government filed its answer on 28 July 2015. Based upon the pleadings of counsel, on 28 December 2015 this court ordered the previously mentioned *DuBay* proceeding in order to develop facts necessary to resolve appellant's ineffective assistance of counsel assignment of error. The *DuBay* proceeding was conducted over a period of 14 April 2016 through 7 November 2016. The *DuBay* judge issued his findings of fact and conclusions of law on 9 August 2017 and this case was re-docketed with this court on 22 August 2017. On 19 December 2017, the appellant submitted the case to this court without further assignment of error.

Upon review of the transcript of the *DuBay* proceeding, this court observed that the transcript of the proceeding was not complete. On 15 February 2018, this court ordered the government to prepare a corrected transcript. The corrected transcript was provided to this court on 16 March 2018.

On 31 January 2019, this court specified two new issues, which had not been previously addressed by the parties but were raised by the *DuBay* judge's findings and legal conclusions. Both the government and the appellant were ordered to file their briefs responding to the specified issues not later than 14 February 2019. On 5 February 2019, the appellant requested an enlargement of time to file his brief. On 8 February 2019, that request was granted and the appellant was ordered to file his brief not later than 18 March 2019 and to file any reply brief to the government's answer by 11 April 2019. The appellant filed his supplemental and reply briefs in accordance with the court's ordered timeline.

28

Throughout the post-trial processing and review of the appellant's case, he has not asserted his right to timely appellate resolution, or otherwise requested expedited review. Further, there is no evidence or assertion of any prejudice owing to the delay in the post-trial processing or issuance of this court's decision on the appellant's appeal. Having applied the *Barker* factors to the appellant's case, we find that although the delay in reviewing his case is facially unreasonable, the appellant has suffered no prejudice. *See Moreno,* 63 M.J. 135-36. But after weighing the "non-exhaustive" list of factors to consider when evaluating processing delay under Article 66, UCMJ, we find that some measure of relief is warranted. *See United States v. Tardif,* 57 M.J. 219, 224 (C.A.A.F. 2002). Accordingly, we disapprove the appellant's reduction.

## III. CONCLUSION

The findings of guilty to Specifications 5, 6, and 7 of Charge III are **SET ASIDE** and **DISMISSED WITH PREJUDICE.** Further, only so much of the adjudged sentence consisting of a bad-conduct discharge is approved. The remaining findings as approved by the convening authority and the sentence as modified above are **AFFIRMED.** With this action taken, we find the that no error materially prejudicial to appellant's substantial rights remains. Arts. 59 and 66, UCMJ.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

29